Richard S. Heller, J.
These three claims arose out of one automobile accident and were tried together. Claimant Clifford W. McCormick seeks recovery for damage to an automobile owned by him which was being driven by claimant James E. La Pan and in which claimant McCormick’s daughter, then an unmarried infant, was a passenger, and for medical expenses and loss of services of his daughter. Claimant James E. La Pan *583 seeks recovery for personal injury. Claimant Fancy L. Keohane originally filed her claim for personal injuries by Esther G-. McCormick, her guardian ad litem, but upon motion Fancy L. Keohane was substituted as the claimant.
On Sunday, January 28, 1951, claimant La Pan, using a 1950 four-door Chrysler Windsor Sedan owned by claimant Clifford McCormick, drove claimant Fancy L. Keohane and her sister Phyllis McCormick, from Saranac Lake to Burlington, Vt., for the purpose of taking Phyllis McCormick back to the University of Vermont.
La Pan and Fancy Keohane left Burlington, Vt., about 4:30 p.m. to return to Saranac Lake with La Pan driving and Fancy Keohane riding in front beside him. It became dark between 5:00 and 5:30 and about 6:10 or 6:15 p.m. they arrived at Westport. At Westport, La Pan proceeded west on Route 9-F. A light, fluffy snow had started to fall sometime after 5:30. As La Pan left Westport, there was a wind blowing and the highway was clear.
From Westport, Route 9-F was a 24-foot macadam pavement with good sight lines and very few curves of any marked degree of sharpness. La Pan had never traveled over this highway before. This 24-foot pavement which had been constructed pursuant to contracts let in 1948 and accepted in 1950, terminated and for about a half mile west from that point to a bridge over the Bouquet River there was only an 18-foot macadam pavement. This half-mile stretch in which the accident occurred, was accepted by the State in 1921 and apparently the only work done by the State thereafter up to the time of this accident, was resurfacing in 1940.
This half-mile stretch of the highway descended from a higher elevation at about where the 1950 construction ended, in a gully or ravine toward the Bouquet River. To a point approximately 550 feet east of the bridge over the Bouquet River, the lower portion of the ravine was to the south of the road, but at that point the road crossed the center line of the gully at which point a culvert carried water flowing in the gully under the road and the lower portion of the gully continued on the north side of the road into the Bouquet River.
On this downgrade on the north side of the road, there was a nonreflectorized cast iron sign 35% inches long by 24 inches in height bearing the legend “ Warning ” and under that the word “ Curve ” with an arrow pointing left. About 380 feet west of that sign, the highway curved to the left at about 11 degrees and this curve continued for a distance of about 225 feet. At the westerly end of this curve there was a guardrail *584 which extended west for about 50 feet along a straight stretch following the curve.
This straight stretch of road extended westerly about 168 feet at which point the highway curved sharply to the left with a varying rate of curvature for a distance of about 195 feet. On the north side of this curve there was a guardrail starting about 2 feet east of the beginning of the curve and extending west for about 61 feet. This guardrail diverged from the pavement since the easterly post was 3.7 feet north of the pavement while the westerly post was 4.2 feet north of the pavement.
About 25 feet west of the west end of the guardrail and about 12 feet north of the pavement, there was a nonreflectorized sign with a yellow background bearing the inscription “slow”. This sign was approximately in line with an extension or projection of the guardrail which ended 25 feet east of the sign. About 45 feet west of the “ slow ” sign there was another sign about 11 feet north of the pavement bearing the inscription “ Elizabethtown ”. The guardrail then resumed and continued along the north side of the road to the bridge. The ground to the north of the guardrails and signs dropped off sharply in the form of a precipice to the Bouquet River. On the south side of the road around this curve to the left, a steep bank rose abruptly from a few feet south of the pavement.
This second curve to the left following the “ Warning ” “ Curve ” sign, was not a uniform curvature. At the start of the curve heading westward, the rate of curvature was less than on the center of the curve. While the construction plans for this curve which was completed in 1921 showed a 22-degree curve, the measurements made in 1953 indicated a 52-degree curve.
Approaching the first curve to the left, the highway descended on a 5 or 6% grade and then flattened out at the westerly end of the curve and remained fairly level until just west of the commencement of the second curve to the left where the downgrade became approximately 8%.
On the left-hand side of the road about 58 feet west of the west end of the second curve, there was a stone wall about 7 feet south of the pavement which ran along the road for about 40 feet to the west where it curved away from the pavement to form a border for a private road.
As claimant La Pan drove west, he left the portion of the highway constructed in 1950 and noted that the pavement-narrowed and there was a downgrade. He used the brake and slowed his speed so that as he entered the first curve to the left he was traveling at 35 miles per hour or less, On that *585 curve he noted snow on the road and as the curve ended the road appeared to straighten out and he observed the guardrail at the beginning of the second curve to the left. He saw the ‘ ‘ slow ’ ’ sign about 25 feet west of the end of that guardrail and applied his brakes and then observed the sharper curve to the left. As he was coming out of that second curve to the left, the car skidded and failed to respond to efforts to correct the skid. The car went across the road and struck the pillar at the east end of the stone wall on the south of the pavement which is about 58 feet west of the end of the curve.
There is uncontroverted testimony in the record that this second curve to the left on which the car started to skid, as it existed at the time of the accident, was not in accordance with standards established by the State at the time of acceptance in 1921. The sign, consisting of a warning of a curve to the left located 380 feet west of the first curve to the left and 773 feet west of the second curve to the left, was not only shown to be contrary to accepted practice, but was patently insufficient to warn of the second curve to the left. The ‘ ‘ slow ’ ’ sign was actually located on the second curve to the left and could not possibly have afforded warning of the existing danger.
The State has an affirmative obligation to construct and maintain its highways in a reasonably safe condition for travel at all times. (Boyce Motor Lines v. State of New York, 280 App. Div. 693, affd. 306 N. Y. 801; Doulin v. State of New York, 277 N. Y. 558.) Here the evidence supports the finding that the highway as it existed with these two curves to the left, was not constructed and maintained in accordance with the State’s own standards of safety in effect at the time of acceptance of the highway in 1921.
Even where a dangerous condition exists for which the State is not responsible, the State has an obligation to give proper and sufficient warning of the danger. (Barna v. State of New York, 267 App. Div. 261, affd. 293 N. Y. 877.) Such warning-must be commensurate with the existing hazards and sufficient to warn users of the highway that they are approaching a hazardous situation. (Dawley v. State of New York, 186 Misc. 571.)
Here the State failed to carry out its obligation. In effect the State created a trap for the reasonably prudent driver by constructing a modern 24-foot highway adequate for the speed limit of 50 miles per hour, followed without warning of any kind by an old, narrow pavement with one curve marked but an immediately following and much sharper and more dangerous curve unmarked.
*586 There is no showing of any contributory negligence on the part of any of the claimants. The driver of the automobile acted with reasonable care. While the application of the brakes may have contributed to the skid, this could not constitute contributory negligence where the driver was suddenly faced with an increasing curve of which the State had failed to warn. (Sporborg v. State of New York, 226 App. Div. 113.) Under the circumstances the State could and should have foreseen and anticipated such an accident as occurred here. Certainly the State had full knowledge or was chargeable with full knowledge of the existing conditions.
The court finds that the negligence of the State was the proximate cause of this accident.
As a result of the negligence of the State, claimants suffered substantial injury. Claimant Nancy L. Keohane suffered extensive injuries to her left ankle and foot. Immediately after the accident she was taken from the automobile to the Elizabeth-town hospital in a state of shock. The following day X rays were taken and a cast put on her left foot and leg. She had a number of fractures of various bones in the left foot and ankle. There was considerable injury to ligaments. She was confined to the Saranac Lake hospital until about the middle of February, 1951 and underwent considerable pain in efforts to correct the fractures and disturbance to her foot and ankle by manipulation and application of casts. She was confined to her bed at home until about the end of February, 1951 and after that was able to move around only with crutches. By the end of March she resumed attendance at high school but was able to do so only with the use of crutches and had to be driven to and from school. She used crutches until the end of June and her left leg was in a cast above the knee until the end of March at which time it was replaced with a cast below the knee until the end of May, after which she was required to wear a ski boot until the end of June. She was able to enter college in the fall of 1951 but had a very decided limp during her first year at college and her activities were limited. She completed her college course graduating in 1955 and started teaching in September, 1955. She still has considerable limitation in the use of her left ankle and foot and her participation in "normal activities of her colleagues is somewhat limited. She still suffers pain from her injuries and some degree of disability in the left ankle and foot and some continuation of pain appears to be permanent.
At the time of the injury claimant was 16 years old. In spite of the extent of the injury she was able to graduate with her *587 high school class and complete her college education and embark upon her _ chosen profession. It does not appear that the permanent character of her injuries is such as to result in any loss of earnings or interfere with a normal home life.
Claimant Nancy L. Keohane is entitled to a judgment against the State of New York in the amount of $10,500.
Claimant La Pan suffered a cut over his left eye which required 10 or 12 stitches and lacerations of his left elbow and right knee. He also suffered a fracture of the maxillary antrum on the left side of his face and some injury to the antorbital and supraorbital nerves on the left side of his face resulting in a permanent numbness in the area of his left cheek and a tingling sensation above the eye. He was unable to see from his left eye for a period of two and one-half to three weeks. He was able to resume part-time work only about three weeks after the accident. He suffered from very severe headaches for about two weeks which gradually subsided and substantially disappeared after about a month.
Claimant La Pan was confined to the hospital only on the night of January 28, 1951 and on the day of February 10, 1951 when he underwent surgery to correct the fracture of the maxillary antrum. Apparently the only permanent effects of the injury are a scar over the left eyebrow, a slight flattening of the left side of the face and a numbness in the area of the left cheek.
Claimant La Pan had special damages of $235.50 and he is entitled to a judgment in the total amount of $1,735.50.
The claimant Clifford W. McCormick was the owner of a 1950 Chrysler automobile involved in the accident and hie was the father of and responsible for the medical expenses of claimant Nancy L. Keohane. The automobile had been purchased about four months prior to the accident at a cost of $2,594.80 and had been driven between 5,000 and 5,500 miles. The only testimony pertaining to the damage to the automobile established the depreciation in that period of four months of between $350 and $400 and a salvage value after the accident of about $900. The medical care of the infant Nancy L. Koehane cost $653.50.
The claimant Clifford W. McCormick is entitled to judgment against the State of New York in the total amount of $1,948.30.
Let judgments be entered accordingly.